By the Court:
We entertain no doubt but that the extension of the stock of the original company, in April, 1814, and the regulations subsequently entered into for managing its affairs, were obligatory upon all the parties; and as all the matters litigated arose subsequent to that event, they must be decided by the rules and regulations made under the new organization. The power .to borrow meney for the use of the company, and to bind the members to repay it, results necessarily from the'power to contract. It seems inherent in all trading companies, unless specially restrained in the articles of association.
The real question-now before the court, and the only one of importance to the parties, is, whether the complainants can hold the defendants, Galbraith, Hamilton, the Wilsons, Hunter, Carrol, and Hoge, to be members of the company, as amongst themselves, and claim contribution of them to make up the losses sustained ? The application to charge them is made to a court of equity, and the facts and circumstances upon which it must be decided, though involved in voluminous papers, are, in truth, confined to a very narrow compass. The partners agree amongst themselves that each one shall be authorized to sell out his interest in the company a'nd substitute in his place a new partner, whom the others are bound to receive, upon complying with certain previous conditions. He shall first offer his stock to the company, and he shall, secondly, pay up so much of it as shall have been called for. These two conditions being performed, every member had an absolute right to transfer his stock on the company books, and the -company were bound to receive his assignee, and look to him for all subsequent liabilities.
When the company were in full operation, in June, 1814, Galbraith transferred his stock, and his assignee was received *and acted with as a member. In April, 1815, the same facts occurred as to Hamilton. At this period no debts were incurred. In June, 1816, Hunter and the Wilsons transferred their stock, and their assignee, previously a member of the company, was received to represent their shares. From this period no one ■of the sellers took any part in the business of the company, nor *419 Were ever treated by the acting and officiating members as partners. When Hunter and the Wilsons sold their stock, the company were indebted, and part of the complainants were personally and individually liable for the debts. But the company property was estimated at a larger sum than the debts due; and the assignees, who under the assignment became members, at least in equity, were also solvent in their circumstances. The company proceed in their business, associate with the assignees as members until the company itself, as such, becomes insolvent, and until the assignees become individually insolvent; and then, after a lapse of more than four years, set up a claim that the defendants, so long disregarded as partners, are to be treated as members, for the purpose of compelling them to share the loss ! And this claim they ask a court of equity to enforce, upon the ground that the assignments were not formally made, and therefore do not techni■cally and legally divest the interests of the defendants. ■ This certainly is not the ordinary and natural office of a court of equity.
It is admitted in argument, indeed it could not be controverted with any hope of success, that the assignments in this case were operative in equity, and would entitle the assignees to share the profits, and to a division of the stock. Suppose that suddenly after these transfers were made, the business of the company had created great profits, and the assignors had refused to make the transfers on the books of the company, and the company had refused to recognize the assignees, or pay to them their dividends, nan it be doubted that a court of equity would have decreed relief? Suppose that, after notice of the informal transfer, the assignors had become insolvent, and the company had persisted in paying them dividends, would not a court of chancery have decreed a transfer, and compelled the company to recognize the assignees as members, and account to them for the dividends paid out?
^Suppose, again, that the creditors of the company, at the time of the transfer, or at a subsequent time, had subjected the assignors to the payment of a portion of the debts upon the doctrine now set up by the complainants that they remained legally members of the company, would not a court of equity give them relief upon the very ground that, in equity, they had ceased to be members, had ceased to have any chance to share the profits, had «eased to act, and that others had been received in their places?
Again: Suppose that, in 1817, a suit at law had been brought *420 against the company for a debt contracted in 1817, and the assignees were made defendants, and the asignors omitted, would that matter avail in a plea in abatement? Would the informality of the assignment be held to counteract the conduct of all the parties, and to fix their rights in contradiction to their own proceedings and acknowledgments? On these points we entertain nodoubt ourselves, and we conceive there is little room for any one' to doubt.
It would, obviously, be most unjust that those who sold out of a profitable concern, or out of one which, though losing, was still-solvent, whose assignee was solvent at the time, and was received and treated by the company as a partner, should afterward be made a partner to subsequent insolvency by a mere informality in making the contract. If this may sometimes occur at law, we can conceive no case in which a court of equity should be made an instrument to produce such a result. And such must be the result if we give the aid which the complainants now ask of us.
But we do not consider that there is any such defect in the transfers as requires the aid of chancery to perfect them. The form or mode prescribed by the articles was intended to confer upon each member the absolute right to transfer his stock, and dissolve the-partnership as to himself and the other partners. This provision-is not regarded as precluding the company from admitting assignments in a different mode, either by positive resolution or by tacit acquiescence. They have, in the case before us, recognized the assignees as their partners by acting with them; and they have •recognized that the assignors were no longer members by ceasing to consult with them. And this conduct, on their part, concludes the complainants.
*lt is urged, in argument, that a certain part of the complainants, who have individually made themselves liable for the debts of the company, may be considered as creditors. But that, we think, can not mend their case. They can not merge the character of partners in that of creditors. And we are by no means satisfied that creditors, who became so with a perfect and full knowledge of all the circumstances, would be aided, in equity, to charge the assignors of the stock. Had it been the intention of the complainants, who were individually liable for the debts due when Hunter and the Wilsons transferred their stock, to look to them-for contribution, notice ought then to haye been given them of such *421 intention. If there were then no such intentions the claim can not now be set up. It would be a fraud to conceal the intention in the first place; and there is no principle for originating a claim upon subsequent matter, which was not contemplated when the transactions, out of which it arises, took place.
We hold, therefore, that G-albraith, Hamilton, Hunter, the two Wilsons, and Carrol are discharged. For it is in proof that Kells was recognized by the company as the assignee of Carrol. There is not satisfactory proof that the company ever received Gray as the assignee of Hoge; the latter must consequently be held liable. No appeal having been taken by the complainants, from so much •of the decree as dismissed the bill as to Kells, he is now before the •court.