## CARTER *v.* McCLURE.

### (*Nashville.* January 9, 1897.)

1. PARTNERSHIP. *What constitutes.*

   A partnership is created by an agreement entered into by the members of an "Alliance lodge," whereby they, in consideration of reduced prices and expected profits, subscribe severally for "stock" in a co-operative store, to be organized without incorporation, and the stock to be under the control of three directors, to be elected annually by the lodge, to act in conjunction with the principal stockholder, who is to be the principal salesman. (*Post, pp. 110–116.*)

   Cases cited and approved: Mallory *v.* Oil Works, 86 Tenn., 598; 65 Ill., 532; 19 Ind., 44; 27 Ind., 399; 20 Me., 413; 60 N. H., 294.

2. SAME. *Dissolution.*

   Members of a partnership are estopped, as against the firm creditors, to claim that a dissolution resulted from changes in which they concurred or acquiesced. (*Post, pp. 116–118.*)

3. SAME. *Same.*

   A partnership for the term of five years, "unless two-thirds of the stockholders agreed to discontinue the business in a shorter time," is not dissolved by a sale of his transferable shares therein by a member. (*Post, pp. 116–118.*)

   Cases cited and approved: 124 Mass., 81; 50 Vt., 668; 57 Vt., 316.

---

### FROM FRANKLIN.

---

Appeal from the Chancery Court of Franklin County. T. M. McCONNELL, Ch.

BANKS & EMBREY and ESTILL & LYNCH for Carter, Dunbar & Co.

J. H. HOLMAN and MARTIN & LITTLETON for McClure, Lucas & Co.

BEARD, J. The bill in this cause was filed by complainants, as creditors of McClure, Lucas & Co., seeking to hold the defendants liable for the debts of that concern, upon the theory that it was a commercial firm, of which defendants were members, at the time of the creation of these debts. The facts, so far as they are important in the decision of this case, and as they have been found by the Court of Chancery Appeals, are, that these defendants, with others who are not sued, all members of an Alliance lodge in the town of Huntland, in this State, entered into an agreement among themselves to raise a sum of money, which, it was · assumed, would be sufficient to establish a co-operative store in that place. This agreement was reduced to writing, and the names of the parties in interest were by them affixed to it, and over against his signature was placed the amount which each subscriber obligated himself to contribute to this joint enterprise. This agreement is in words and figures following, to wit :

"HUNTLAND, TENN., Dec. 31st, 1888.

"We, the undersigned, agree to pay to the directors, to be elected, the sum annexed to our respective names, by the first of January, 1889, for the purpose of establishing a co-operative store at

Huntland, Tennessee. We further agree that the said money remain in the business for at least five years from beginning, unless two-thirds of the stockholders agree to discontinue the business in a shorter time. We further agree that three of the stockholders be elected annually as directors, to have full control of the stock hereunto subscribed. It is further agreed that the directors act in conjunction with R. W. McClure, who is a stockholder to the amount of $2,050, and who is to be the principal salesman, and in the transaction of all business between the said McClure and directors, the directors are to be regarded collectively or as a unit, and the said McClure as a unit.''

After the execution of this paper, the three directors provided for in it were duly chosen, and into their hands the subscribers paid the several sums they had agreed to contribute. These sums, aggregating $590, were turned over by the directors to Mr. McClure, who, adding the amount of $2,050, which he had agreed to place in the venture, purchased a stock of goods, and opened up a co-operative store in the name of R. W. McClure & Co., this being the business name agreed upon by McClure and the three directors. No incorporation ever took place, nor was such ever intended by these parties. The main purpose of the defendants in entering into this business was to avoid what they deemed to be the extortion theretofore practiced upon them in the sale of goods by the merchants of the country.

While not embodied in their writing, yet one of the terms of the contract, and the one which chiefly, if not altogether, induced all the subscribers (save no doubt McClure) to become interested in this enterprise, was that they were to purchase such goods as they might require from the stock in this store at a profit not exceeding ten per cent. above cost; and these directors were chosen as their representatives especially to look after McClure, who was the largest shareholder, as well as manager, and see that he kept faith with the subscribers in this matter. While the defendants, styling themselves in their written agreement as ''stockholders,'' took no active personal control of the concern, yet they manifested a lively interest in its success; in addition to giving it the benefit of their own patronage, they were zealous in commending it to their neighbors. At the end of the first year, one Mosely desired to purchase an interest in the business. He, however, was not a member of the ''Alliance,'' and organized as this enterprise was, in line with or under the inspiration of that movement, it was necessary that he become such before he could be allowed to make such purchase. In order to qualify him to this end, the rules of the ''lodge,'' to which these defendants belonged, were suspended, and at one meeting he was admitted to the privilege of full fellowship with them. He contributed $2,000 to the capital of the concern, and its name was changed to McClure, Mosely & Co. At the end of another term of twelve

months, Mosely sold out his interest to one Lucas, and thereafter the enterprise was conducted in the name of McClure, Lucas & Co., until insolvency overwhelmed it with disaster. The claims of complainants accrued during the existence of and against this latter concern. In addition to these changes in the organization of and style of the business, two deaths occurred among the original subscribers—one of them before and the other after the creation of these debts. This latter death, however, can in no way affect this controversy, and will, therefore, not be further noticed.

Upon this state of facts, it is insisted for the defendants, first, that this undertaking was in no sense a partnership, and that they did not sustain the relation of partners to either R. W. McClure & Co., Mosely, McClure & Co., or McClure, Lucas & Co.; secondly, if, however, they are mistaken in this broad proposition, then that they were only partners in the firm of R. W. McClure & Co., and that all partnership relation and liability, on their part, were terminated or dissolved by the various changes already adverted to, and long prior to the creation of complainants' debts. The Chancellor and the Court of Chancery Appeals held both these contentions against the defendants, and the case is now before us on an appeal from the decree of this last-named Court.

1. Were these parties engaged in a partnership enterprise? All of the defendants earnestly disclaim

14 P—8

any purpose of entering upon such an undertaking.
While, as has been stated, the prime motive of these
parties was to organize a mercantile establishment,
where their various needs would be supplied at rea-
sonable figures, yet they confess that, outside of this,
they expected to share in any profits earned by it,
in proportion to the respective amounts contributed
by them. These amounts were small, yet they were
to serve as a basis for such distribution of profits.
It is, no doubt, true that the defendants did not
contemplate a partnership, and each supposed that he
was simply taking a share in a joint stock enter-
prise, in which all he risked was the small sum
paid for such share, yet it is for the law to deter-
mine, on the facts already given, whether a part-
nership was created, with all its attending liabilities.

In *Mallory* v. *Oil Works*, 86 Tenn., 598, is
quoted approvingly the definition of a partnership
as given by Judge Story. "A partnership," says
that writer, "is usually defined to be a voluntary
contract between two or more competent persons
to place their money, effects, labor, and skill,
or some or all of them, in lawful commerce or
business, with the understanding that there shall be
a communion of the profits thereof between them."
Story on Part., Sec. 2.

The facts found by the Court of Chancery Ap-
peals, a general outline of which is given above,
disclose the constituent elements of a partnership,
as required by this definition. It is a case where

these parties have embarked their money "in lawful commerce," "with the understanding that there should be a division of profits" earned.

In addition to this, they have taken a firm name, and thus have advertised themselves to the world as a commercial partnership.   Calling their contributions to the capital of this business a "subscription for stock," and taking certificates for their payments from the company as a joint stock company, it not being incorporated, cannot alter their liability. "There is no intermediate association, or form of organization, between a corporation and a partnership, known to the common law, and, unless otherwise provided by statute, as is the case in England and New York, a joint stock company is treated and has the attributes of a common partnership." 1 Bates on Part., Sec. 72.   And Judge Story says that "in joint stock and other large companies which are not incorporated, but are a simple, although an extensive, partnership, their liabilities to third persons are generally governed by the same rules and principles which regulate commercial partnerships."   And such has been the conclusion of the Courts wherever the character of joint stock companies similar to the one in question has been passed upon, so far as our examination has disclosed. At least such was the holding in *Hodgson* v. *Baldwin*, 65 Ill., 532; *Renyon* v. *Williams*, 19 Ind., 44; *Manning* v. *Gosharie*, 27 Ind., 399; *Beaman* v. *Whitney*, 20 Me., 413; *Farnum* v. *Patch*, 60 N. H., 294.

The Supreme Court of New Hampshire, in this last cited case, have delivered an able, exhaustive opinion upon the law of partnership as it applies to an association like the one in question, and we content ourselves with what we have already said, and by making special reference to that opinion.

In the light of these authorities, we think there can be no doubt that these parties were partners in the firm of R. W. McClure & Co.

2. We think it equally clear, on the facts of this case, and in view of the legal principles applicable to them, that there was no termination of the partnership enterprise resulting from the changes occurring during its progress, by the introduction and subsequent withdrawal of Mosely, and the accession of Lucas or his capital to it, or the death of one of the original subscribers, intermediate between the start of this business and the final insolvency of McClure, Lucas & Co.; that, through all these changes, the defendants' relations remained as fixed by themselves in the beginning, and that they are liable as partners for the debts sought to be enforced in this cause. This conclusion we rest on two grounds: (1) It is found by the Court of Chancery Appeals to be a fact that these defendants were members of the Alliance lodge that, by a suspension of its rules, hurriedly qualified Mosely, so that he might bring his capital and his name to the aid of this joint undertaking. They do not claim to have been ignorant of this proceeding, or

to have offered any opposition to it, either in or out of their lodge, or that they made any protest against his accession to the business. On the contrary, their zeal for the success of the movement continued undiminished. And so with regard to the withdrawal of Mosely, and the introduction of Lucas in his room and stead. The record shows consultation with quite a number of these defendants as to the advisability of this change, and an agreement with them in regard thereto, and acquiescence, at least by silence, on the part of the remainder. All these parties, through the various changes in the personnel of the organization, by death and purchase, and in the firm name under which the business was carried on, not only stood by and watched the movements of the concern as one in which they had a part, but they made no claim of dissolution by reason thereof, until confronted by the claims of these complainants. It was then too late, for, conceding that either one of these acts might have been availed of by the defendants as working a dissolution of their partnership, yet, at their election, they might waive this effect.    (2) The nature of this enterprise repels the idea that it was in the contemplation of the parties that either death or any transfer of shares should work a dissolution of the business. Not only was it to continue for five years, "unless two-thirds of the stockholders agreed to discontinue the business in a shorter time," but the shares of the stockholders were transferable.

Says Mr. Bates, in his work on Partnership, Vol. I., Sec. 72: "The fact of transferable shares makes such an association different, not merely in magnitude, but in kind, from ordinary partnerships, because not based upon mutual trust and confidence in the skill, knowledge, and integrity of every other partner. Hence, a sale of his shares by a member, the shares being transferable, is not a dissolution. Death of a member is not a dissolution, if such was the intent and the character of the association, in that the shares are transferable and it is governed by officers and is in the form of a corporation, is evidence of such intent." What the text-writers and the opinions of many Courts call the *delectus personarum*, an element in an ordinary commercial partnership, is lacking when the partnership assumes the character of a joint stock company with transferable shares. 2 Bates, Sec. 581; *Machinists' National Bank* v. *Dean*, 124 Mass., 81; *Walker* v. *Wait*, 50 Vt., 668; *McNeist* v. *Hulless Oat Co.*, 57 *Ib.*, 316.

It follows that the assignments of error upon the decree of the Court of Chancery Appeals, in the particulars above indicated, must be overruled. The assignments of error upon the Court's decree as to the Lipscomb claim is disposed of only. The decree of that Court is in all things affirmed.