(Hamilton County Common Pleas.)

## WILLIAM F. WEHRMAN v. FRANK B. McFARLAN et al.

(1). An unincorporated joint stock company with transferable shares, formed to purchase and improve a certain tract of land by making contracts which involve a jiont name and fund, incurring debts, subdividing and selling lots and dividing profits, and which is managed by trustees subject to the shareholers, is a partnership.

(2). Every person appearing on the books to be an absonte owner of a share is liable to those who were creditors during such ownership, even though he had no beneficial interest in the share, except that, if the share was taken in his name without his knowledge or consent or subsequent acquiesence, he is not liable.

(3). One who, as the stock books affirmatively show, holds his shares merely as trustee or pledgee, is not liable. Nor is a pledgee liable who does not take a transfer on the corporation books; nor, if he has a transfer made to some third person or employe to hold for him, though such person would be liable.

(4). Transfer of his shares to another does not release a member from existing liabilities unless creditors consent, but does release him frcm future liabilities. Yet his assignee of the shares assumes the antecedent liaiblities of the assignor who thereafter is only secondarily liablle.

(5). One held liable because appearing on the books as owner of a share can require the real owner to reimburse him for losses.

(6). A national bank becoming absolute owner of a share for a debt can not escape the liability of a shareholder on the doctrine that its ownership is ultra vires.

———

SPIEGEL, J.

On February 13, 1889, one John Woltz obtained from J. S. and G. W. B. Cleneay a ten years' lease of one hundred and sixty-five acres of land north cf and near Cincinnati, paying $65,000 down, and agreeing to pay a quarterly rent of $2,000, with a privilege of purchase for $200,000. The ground was obtained for purposes of subdivision, and the lessors agreed, as lots were sold, to execute deeds to the purchasers and to receive all the purchase money at the rate of $2,000 per acre, including streets, and to abate the rent on the balance proportionately.

On February 15, 1889, Woltz conveyed the leasehold to M. A. Spencer, James McArdle and Frank B McFar-

lan, as trustees, for a recited consideration of $100,000. The beneficiaries of the trust, together with the trustees, formed what was called the Elsmere Syndicate, and, on March 11, 1889, the members of the syndicate executed and recorded to the trustees a deed in which the interest of the members was recited to be in the proceeds of sales of lots, and in the rents, issues and profits of the tract, and that the trustees have issued to each shareholder a certificate designating the number of shares he is entitled to. The trustees were given power to plat, subdivide, improve, sell, lease or convey, and to them were granted all the rents, issues, profits and moneys to be derived from sales, in trust, "First, to pay for surveys, plats, subdivisions and all other expenses for improvements, necessary for the selling and leasing of said property; second, to pay the purchase money to the Cleneays; third, to pay the balance to the certificate holders."

By May 1, 1889, the members had perfected their by-laws, which provided for officers, viz., president, vice-president, secretary and treasurer, and three trustees, the present trustees to remain in office during the life of the syndicate, and to have all the powers given by the foregoing declaration of trust, sign all orders tc pay money, make and execute all contracts of the syndicate, and have general supervision over its affairs, with power to employ counsel and contract with agents to sell the property. Annual meetings of the members were to be held every April, and from October 23rd, 1890, monthly meetings of shareholders were held. The number of shares was forty, each costing $3,000. A further loan of $300 per share was resolved upon in October, 1890.

The trustees proceeded to subdivide, grade, pave streets and sell lots.

Without detailing the various vicissitudes of the enterprise, suffice it to say that it resulted in loss. Debts outran resources, taxes and ground-rents became in arrears, and the lessors foreclosed in the United States Circuit Court in 1897, and bought in the unsold land at marshal's sale, and

got a deficiency judgment against the trustees for over $12,000.

During the life of the association, many of the individual members sold or pledged their shares which on their face provided for transfer on the books in case of sale.

This suit is brought by one of the shareholders for an accounting between the members and to wind up the affairs of the syndicate.

I desire to acknowledge to counsel the careful, thorough and searching briefs and arguments which they have furnished to the court. Before proceeding to particulars, it is necessary to settle on the general principles of law underlying the case, to-wit, (1.) What is this syndicate? (2) Who of the assignees of shares became liable? (3) For what did they become liable?

(1) Whether the syndicate is a partnership or not, would not affect the liability of the shareholders to pay debts and to equalize burdens among themselves. Kahn v. Smelting Co., 102 U. S. 641, 646.

Although the defendants, each and all, earnestly disclaim any intent to become partners, the association is doubtless a partnership rather than anything else. Artificial business associations in Ohio, that is leaving out clubs and organizations not for profit, are either corporations or partnerships. There is nothing intermediate. Any joint stock association which authorizes the use of a joint name, the accumulation of a joint fund, the making of contracts, the creation of debts, and the acquiring of pecuniary profits to be divided, whether its purpose be to deal in commodities or in land, or to purchase, lay out and sell a paricular tract of land, and although directly managed by trustees, is not a trust, for the cestuis control the trustees, and all are equally interested; nor is it a tenancy in common, for the relation of the parties to each other is not a property relation, but a contractual relation. It is therefore within the category of McFadden v. Leeka, 48 Ohio St. 513; Carter v. McClure, 98 Tenn. 109; Davison v. Holden, 55 Conn., 103; and is a partnership with transferable shares. The ground of liability, however, is not because the members are credited as partners, for the concern alone may have been known; nor because they are held out as such, for they may never have been held out; but because they are in fact the principals in any and every transaction. See Davison v. Holden, 55 Conn., 103.

Hence, the plaintiff is entitled to an accounting and to have the concern wound up.

II. Who are shareholders liable for debts, where there are original shareholders and assignees of shares, some of whom own absolutely, some as pledgees with transfer on the books, and some without, and some with transfer to third persons for the pledgee?

(a). It goes without saying that absolute owners of shares, whether by original subscription or subsequent transfer, are liable for debts. Such is the law of partnership. Wells v. Wilson, 3 Ohio 425 Rianhard v. Hovey, 13 Ohio 300.

The only limit to this rule is, that where stock is subscribed and paid for by one person in the name of another, who does not know of or consent to it, and has not ratified it, the latter is not liable, but the former is. A good illustration of this is Wadsworth v. Duncan, 164 Ill., 360.

Beyond this, the rules applicable to the pledging or transfer of corporate stock apply here also. Everyone whose name appears on the books as absolute owner of a share is to be held liable as a partner. The courts will not look beyond the legal title; and hence, one who appears as shareholder on the books cannot show that he holds merely as collateral security for a loan. Pullman v. Upton, 96 U. S. 328; nor that he is in fact a mere trustee; Lewis v. Switz, 74 Fed. Rep., 381; Kerr v. Urie, 86 Md., 72; Daivs v. Essex Baptist Society, 44 Conn.,582; Henkle v. Salem Mfg. Co., 39 Ohio St., 547, 552; Stewart v. Triumph Ins. Co.,1 W. L. B., 103.

But in this case he is entitled to look to the real owner for reimbursement, since the latter is also liable, (see Rev. Stat. sec., 3259), and creditors

may resort to both; *Foster v. Lincoln*, 74 Fed. Rep , 382.

(b). If, however, he is named in the transfer and on the books as trustee or pledgee, he is not liable, for notice is thereby conveyed that he does not claim to be owner. *Pauly v. State Loan & Trust Oo.*, 165 U. S. 606; *Lucas v. Coe*, 86 Fed. Rep., 972.

In such case, his cestui, the real owner, although not named, is liable as the shareholder. See Rev. Stat. sec. 3259, and *Henkle v. Salem Mfg. Co.*, 39 Ohio St., 547, 552.

(c). An assignment of a share as collateral without transfer on the books to the pledgee, will not make such pledge liable. *Henkle v. Salem Mfg. Co.*, 39 Ohio St., 547.

(d). If the pledgee, never having had the shares in his own name on the books, has them transferred on the books to another for the sake of greater security, or in order the better to control them, even if such other is his employee, the pledgee is not liable as a shareholder, unless he makes himself such by participating in the management or otherwise acting as owner. *Anderson v. Philadelphia Warehouse Co.*, 111 U. S. 479; *National Park Bank v. Harmon,* 79 Fed. Rep. 891, and the same case, 25 C. C. A., 214; *Borland e. Nevada Bank,* 99 Cal., 89.

Here also the pledgor must indemnify the person in whose name he has transferred his share.

III. The next question is, When does the liability terminate?

(a) A member who transfers his shares remains liable to then existing creditors as a matter of course; for being once liable he cannot by an act of his without creditors' concurrence release himself. All the decisions seem to recognize this.

(b) It remains to examine the question whether in the absence of special agreement the purchaser of a share assumes only subsequent liabilities as in an ordinary firm where the incoming of a new member constitutes a new partnership, and the assets alone, and not the partner personally, are liable for old debts; *Morss v. Gleason*, 64 N. Y., 204; or whether the rule of transfer of corporate stock applies,

viz., that the buyer of the share takes *cum onere*, for better or worse, his assignor being liable only if he is unable to pay, and, in inverse order, back to the accruing of the liability. *Mason v. Alexander*, 44 Ohio St., 318.

In *Wells v. Wilson*, 3 Ohio 425, the Supreme Court held the assignees of shares liable for prior debts. In *Rianhard v. Hovey*, 13 Ohio 300, they held the assignee of a share not liable for prior debts, but liable for subsequent debts and no more, and did not notice their former decision. It is urged that the latter case states the Ohio law, and that the former decision can be reconciled by resting it on the by-law, "that stock shall be transferable on the books of the company in such manner as to entitle the assignee to all the rights and privileges and to subject him to the same liabilities and penalties as the assignor."

To this claim, there are two answers: First, the court did not rest its decision on the by-law, nor notice it in its opinion; second, such by-law, read in the light of Mayhew's case and Cape's Executor's case, and the Maine case cited below, is prospective only, and does not refer to existing debts.

On the other hand, it is urged that the earlier decision is the law of Ohio, and that in the latter, the court was merely laying down the relative liabilities as to creditors.

The underlying principle would favor the rule of corporations rather than of ordinary partnerships. The purchaser of a share in a joint stock company acquires all his assignor's interest in the assets, his share of the surplus, if there is any on hand, and of future dividends and profits, and the right to maintain a suit for an accounting and to wind up; and his acquisition of all the rights naturally carries the liability belonging to them, and profit and loss should follow the certificate. And in practice, the value of a share for selling purposes cannot but be reckoned, like corporate stock, on the value of assets as compared with liabilities.

The weight of authority supports this view; the only contrary case be-

ing *Christy v. Sill*, 131 Pa. St., 492, while in Cape's Executor's case, 2 De G. M. & G. 562, the Lord Chancellor says, page 574: "My opinion would be that a person buying a share in a company must also take a share in its debts and liabilities as he finds them;" and that a clause in the by-laws that the transferrer shall be exonerated from future debts is not against transferring past debts to the assignee, and on page 575 he says:

"When, therefore, a purchaser executes the deed of transfer, he becomes bound as from the commencement of the partnership. If this Court was to hold contrary to what has been held in the court below, a blow would be given to transactions of this nature, for it would be impossible any longer to deal with shares in Joint-stock Companies in the manner in which they are now dealt with."

In *Mayhows' Case*, 5 De G. M. & G. 837, 848, it is said that, apart from any by-law, a right to transfer means "to substitute the transferee to all intents and purposes for the transferrer," and to carry "an almost irresistible evidence that it means he should transfer with liabilities begun and rights that were to come." This, however, does not affect the rights of persons outside the company. In *Smith v. Virgin*, 33 Me., 148, 157, it was stated that to make a transfer carry both privileges and liabilities, would render settlements with the company easy and simple. The income would follow the share: whenever dividends were made, the share would be subject to the debts, and the owner liable after the assets were exhausted, without reference to the time when the income was received or the debts contracted. "This would be so in harmony with the wants of the association, that it would be surprising if no such provision should be found in the articles." Accordingly, the court found such provision to be clearly implied in an article reading: "No party shall be discharged from his obligation as a member by transfer of his share until certified to the secretary."

In *Savage v. Putnam*, 32 N. Y. 501, it is held that the buyer of a share takes *cum onero*, and this is decided on general principles, and not under the statutes of New York.

In *Wadsworth v. Duncan*, 164 Ill., 360, 362: "Each member is liable for debts unless he has shifted his liability in the very mode pointed out in the articles. Between themselves, as members, and third persons, this liability would exist, but as among the members of the association a different rule would prevail." It was said to be like a new firm buying out an old, and (p. 364) it is difficult to escape the conclusion that the new firm assumed all debts.

To the above cases may be added *Tyrrell v. Washburn*, 6 Allen, 466, where it is said, that although withdrawing members continue liable to creditors for existing debts, yet *inter se* they are relieved, for they cannot sue to wind up; and in *Phillips a. Blatchford*, 137 Mass. 510, it is said that the liabilities must go with the rights.

Analagous to these, is the case of mining partnerships, for they differ only from ordinary firms in having no *delectus personarum*, exactly as does a joint stock company, and of them it was held in *Jones v. Clark*, 42 Cal., 180, that transfers of shares are subject to debts, and the assignor is thereafter only consequentially interested.

The above reasons and authorities require me to believe that Wells v. Wilson is the law of Ohio, whether Rianhard v. Hovey can be reconciled with it or not, rather than vice versa.

(c) An outright sale of a share with transfer on the books terminates liability for future debts, even if the vendee is insolvent. This is the law of Ohio, whatever it may be elsewhere. See *Peter v. Union Mfg. Co.*, 56 Ohio St. 181. But notice to officers or members of a sale without a transfer on the books is not equivalent to transfer, *Harpold v. Stobart*, 46 Ohio St., 397; and the shareholder continues liable, although he may look to his assignee for reimbursement.

IV. Coming now to the individual defendants, it is obvious on the above principles that there is no liability upon the Second National Bank, W. W.

Brown, trustee, Gertrude Marcus, Rebecca D. Brown, Gertrude A. Spencer, and George M. A. Spencer, and they will be accordingly dismissed.

From the facts stated in the answer of Peter G. Dunn's Executrix, it would seem that no judgment on his liability can be rendered unless further assets, real or personal, of his estate are discovered.

Dr. Tenney's case is one of hardship. Dr. Spencer, owing him something and desiring to secure him, had his own certificate No. 2, then deemed to be ample and valuable, surrendered, and a new one, No. 78, made in Dr. Tenney's name November 13, 1893, and delivered it to the doctor. The doctor never participated in the conduct of the concern, nor was he ever present at the meetings, and three or four months later reassigned and redelivered the certificate to Dr. Spencer. Afterward, on receiving a notice of a meeting, he notified Mr. Brotherton, the secretary of the Elsmere Syndicate, that he had reassigned and redelivered the certificate to Dr. Spencer, and that he had no interest in the concern, but he did not notify anyone else. Dr. Spencer did not have the retransfer noted on the books, and the share is still in Dr. Tenney's name. The doctor clearly never intended to become a partner, and did not realize the situation into which he had unwittingly entered. His only fault is the neglect to see that a re-transfer on the books was made. But while Dr. Spencer in law must hold him harmless, under the principles already stated, I do not see how Dr. Tenney can be discharged as to creditors.

Mr. B. F. Ehrmann became a member only by receiving a certificate in his name on the books on April 1, 1889, which was transferred to him as security by J. Woltz, and to whom it was re-transferred, and so entered on the books, on May 2, 1889; hence his liability is confined to debts accruing between these dates.

The case of the Merchants' National Bank is more perplexing. In January, 1892, F. B. McFarlan, being indebted to the bank as endorser on notes of The McFarlan Lumber Company, not yet matured, conscious of his approaching financial difficulties, delivered to the bank all his securities of various kinds, a valuation being placed on each, aggregating the amount of his debt. Among these were nine shares of Elsmere stock, transferred to the name of W. W. Brown, trustee, he being cashier of the bank. The notes of The McFarlan Lumber Company on which McFarlan was liable were surrendered to him, and no new notes taken. Afterward one of the bank's directors, who later became its vice-president, actively participated by virtue of these shares in the management of the syndicate; as one witness says, "became the head of a headless concern and did his best to make it a success, and the shares valuable." Nor do I know, but that he had a right to make this effort to save the bank's interest. Later, when the syndicate was an acknowledged failure, the bank negotiated for the disposition of these shares exactly as if it were the owner. The question here is, for whom was Brown trustee, since his cestui must be held liable in this case. An instructive decision will be found in *Borland v. The Nevada Bank*, 99 Cal., 89. There a debtor of a bank transferred to one of its employes as trustee certain stocks, and the question was whether the bank took it as owner or as collateral. Each party claimed the other to be the owner, the endeavor being to escape the liability of ownership. The California code does not differ from the law of Ohio, as laid down above. No valuation of the securities had been agreed upon, nor agreement to apply them as a credit on the debt. Hence it was decided not to be a sale to the bank, nor a payment; besides, the supposed value of all the securities turned over exceeded the debt, and the bank retained the debtor's notes. Doubtless, as there stated, if the parties are silent, the law infers that a transaction is intended to be one of mutual benefit without loss to either or giving either an advantage not contemplated. But the elements that controlled in that case to relieve the bank, are absent here. A valuation was placed on

each security, and their supposed aggregate value did not exceed the debt, and yet the bank surrendered the notes, and its subsequent action is more consistent with ownership than with any other relation. McFarlan's continuing to act as trustee of the syndicate after thus parting with his stock, is of no significance, for the trusteeship was for the life of the syndicate. The claim that the bank cannot be held, because to become a partner is ultra vires, will not avail. It had the right to take the shares as security, either conditionally or absolutely, and with all the burdens of the title. *National Bank v. Case*, 99 U. S. 628; *American National Bank v. National Wall Paper Co.*, 77 Fed. Rep., 85.

It follows from the above that the Second National Bank, W. W. Brown, trustee, Gertrude Marcus, Gertrude A. Spencer, George M. A. Spencer and Rebecca D. Brown will be dismissed; and that the plaintiff's prayer for an accounting will be granted as against the other defendants.

No judgment will be rendered until after the report of a master, and the court appoints Judge Clement Bates as such master.