Moore, Respondent, vs. May and others, imp., Appellants.

*February 4—March 21, 1903.*

*Partnership: Who are members? Signatures in book: Evidence: Competency of witnesses: Transaction with deceased agent: Adverse parties: Pleading: Striking out sham allegations: Immaterial error: Withdrawal of partners: Continuance of firm.*

1. Articles of a copartnership known as the Farmers' Union, partly printed and partly written, were pasted in a blank book, and on several pages following were pasted separate sheets containing signatures apparently written before the insertion of such sheets in the book. Following these were other signatures written on the pages of the book. In an action to charge as partners several of the persons whose signatures so appeared, the court instructed the jury that if defendants signed on such sheets when the copartnership articles were attached thereto, or if such articles were in some way connected with their signatures so as to form a part of the same and make the same appear as one instrument, then those so signing executed the articles; that the jury were to determine merely whether defendants did sign the articles or the sheets while attached thereto so as to constitute a part of the contract. *Held*, not erroneous as against defendants.

2. It was error, in such case, to refuse to permit a defendant to testify as to what his purpose was, and what the understanding was with reference thereto, when he signed his name on the book.

3. One of the defendants testified, on cross-examination by plaintiff, that ten years before the trial he had paid to an agent of the partnership $1 for the privilege of trading one year at its store and had at that time signed the list of names, handed to him by said agent. The agent was then acting as clerk in the store, but it appeared that he had died before the giving of the note on which the suit was brought. On redirect examination the court held the witness incompetent to testify to the conversation then had with the agent. *Held*, that the exclusion of such conversation was error, under sec. 4070, Stats. 1898, because plaintiff had first examined the witness as to such transaction, and also because the agent was not, within the meaning of that statute, "an agent of the adverse party [plaintiff] or an agent of the person from, through or under whom such adverse party derives his interest or title."

4. In an action against alleged partners, where the answering defendants denied that they were members of the firm, non-answering defendants were not parties adverse to the plaintiff, subject to examination as such under sec. 4068, Stats. 1898; and when they were called as witnesses by plaintiff it was error to refuse to permit the answering defendants to cross-examine them.

5. Under sec. 2682, Stats. 1898, allegations of a verified answer cannot properly be stricken out as sham; but where allegations so stricken out did not constitute a defense, or any part of a defense, the error is immaterial.

6. In an action against partners upon a note given for money loaned to the firm and used in its business, it is no defense that the business was not being conducted in the manner prescribed by the copartnership articles.

7. Articles of a copartnership known as the Farmers' Union provided that any member might withdraw in the manner prescribed, and that each member should be responsible for repayment of money borrowed to run the business. The firm was manifestly to consist of many members and continue for an indefinite period. *Held* that, although some members had died and some had withdrawn before the moneys were borrowed for which the note in suit was given, those who were in fact members at the time of such borrowing may be held liable as partners on the note.

APPEAL from a judgment of the circuit court for Vernon county: J. J. FRUIT, Circuit Judge. *Reversed.*

The complaint in this action alleges, in effect, that on February 16, 1890, the 209 defendants entered into a copartnership under the firm name and style of the "Farmers' Union of Viroqua," for the purpose of carrying on a mercantile business at Viroqua, and that they conducted such business until and for a long time after April 11, 1900; that the business is now closed, and the only thing left to be done is to collect all outstanding debts due the partnership, and the payment of its indebtedness; that the business was transacted by a manager, who bought and sold goods, and borrowed money to run and transact such business, he having the right to sign all notes and other evidences of debt of the partnership; that April 11, 1900, the said partnership, by C. M. Butt, its man-

ager, for value received, executed the promissory note in question, of which the following is a copy:

"$1,696.78.                    Viroqua, Wis., April 11th, 1900.
"[Rev. Stamps, $8.34.]
"Four months after date the Farmers' Union of Viroqua for value received promise to pay to *Samuel W. Moore,* or order, the sum of sixteen hundred ninety-six and 78-100 dollars with interest at 6 per cent. per annum.

"FARMERS' UNION OF VIROQUA,
"By C. M. Butt, Manager;"

that the same became due and payable August 11, 1900; that payment of the same has often been requested, but that no part of it has been paid; that there is due thereon the sum of $1,696.78, with interest thereon at six per cent. per annum from April 11, 1900, for which the plaintiff demands judgment, together with costs of this action.

The plaintiff claims that the agreement for such copartnership was in writing, and the same is in evidence, and is as follows:

"Articles of Copartnership.

"1st.—These articles of copartnership entered into this 16th day of February, 1890, by and between the persons whose names are hereto signed and who shall all be members of the Farmers' Alliance of Wisconsin,

"WITNESSETH, That the name of this firm shall be the Farmers' Union of Viroqua.

"2nd.—That the place of business shall be Viroqua, Wisconsin.

"3rd.—That the business of the firm shall be buying and selling groceries, dry goods, hats, caps, boots, shoes, clothing, flour, feed, seeds, land plaster, barb wire, and other articles of merchandise wanted by farmers. Also farm machinery, and all business of a general store for farmers, and the buying and selling of lumber.

"4th.—That the business is to be run by a committee of management to consist of five of the partners, which shall be elected once a year and meet once each three months, and oftener if desired.

"5th.—That all purchases and sales shall be for cash, and that no infraction of this part of these articles, at least as to purchases, shall be allowed.

"6th.—That the party storekeeper shall receive a reasonable compensation for his services, to be determined on from time to time by himself and the said committee.

"7th.—That all goods shall be bought at lowest possible rates and sold at a sum no greater than will be sufficient to pay costs, carriage, expense of handling, rents, etc., and to reimburse for any losses that may accrue.

"8th.—That goods shall only be sold to members of this partnership.

"9th.—That each of us agree to be responsible for the repayment of any amount of money borrowed by the committee to run the business and agree with each other to contribute any amount necessary to repay the same.

"10th.—It is hereby agreed that any member of this partnership may withdraw therefrom by filing with the storekeeper or business manager his desire of the fact and have the date of such withdrawal entered on the margin of these articles opposite his name.

"11th.—It is agreed that the money to be used in this business and procured by the committee above named, be limited to the sum of six thousand dollars."

Eighty-nine of said 209 defendants made separate answers, but substantially the same, by way of admissions, denials, and counter allegations, to the effect that certain parties not joined as defendants were members of such copartnership, if any existed; that C. M. Butt had no authority to execute the note in question; that such note was executed after such copartnership, if any, had been dissolved by the death of some of the members and the withdrawal of others; that the copartnership was to be conducted and managed by a committee; that all sales should be made for cash and to members only, and that no persons should be admitted to the copartnership except such as were members of the Farmers' Alliance of Wisconsin; that the terms of said copartnership agreement were violated in this respect, and by the manager and committee in contracting indebtedness exceeding the amount of $6,000 stipu-

lated therein; that, if said copartnership existed, it was dissolved as to the answering defendants by the admission of new members without the knowledge or consent of the defendants; that the copartnership became dissolved by reason of the death of certain members, named, who had signed said copartnership agreement; that it became dissolved by reason of the withdrawal of certain members, named, who withdrew according to the terms of such agreement; that their alleged signatures to the agreement were procured by reason of representations made by one N. E. Moody, then manager of the store, to the effect that by paying $1 each and signing lists of customers of the store they could have the privilege of being such customers; that the lists so signed were not a subscription to any contract or articles of copartnership, and that such lists were subsequently and falsely and fraudulently attached to said contract, without the authority of any of such defendants.

At the close of the trial, the jury returned a special verdict, by direction of the court, to the effect (2) that fourteen of the answering defendants named in the question executed the so-called articles of copartnership prior to April 11, 1900, and were, at and prior to such time, members of the Farmers' Union of Viroqua; (3) that the 120 nonanswering defendants named in the question had executed the so-called articles of copartnership, and were members of the Farmers' Union of Viroqua, at and prior to April 11, 1900; (4) that the committee of management, in the spring of 1900, acted jointly in the borrowing of the $1,696.78 from the plaintiff *Moore;* (5) that the $1,696.78 received from the plaintiff *Moore* was used by the Farmers' Union to pay off its past and then existing indebtedness; (6) that four of the answering defendants therein named were not members of the. Farmers' Union of Viroqua at any of the times that any of the money was borrowed from the plaintiff *Moore.* The court also submitted to the jury two questions, which they answered to the effect (1) that seventy-three of the answering defendants named

therein executed the so-called articles of copartnership prior
to April 11, 1900; (7) that they assessed the damages of the
plaintiff at $1,816.88.   Thereupon judgment was entered
against the nonanswering defendants and the eighty-five an-
swering defendants, named, according to the special verdict
so directed by the court and so found by the jury.   From the
judgment so entered, fifty-one of such answering defendants,
named, bring this appeal.

For the appellants there was a brief by *C. W. Graves,
Smith & Griffin,* and *Silbaugh & Bennett,* and oral argument
by *Mr. C. J. Smith* and *Mr. Graves.*

For the respondent there was a brief by *C. M. Butt, Jr.,*
and *Higbee & Bunge,* and oral argument by *Mr. E. C. Higbee*
and *Mr. Butt.*

CASSODAY, C. J.   The important question presented is
whether the appellants ever signed the written articles of co-
partnership.   Those articles are partly printed and partly in
writing, upon a sheet of paper pasted on the second page of a
large blank book containing numerous blank pages.   The
paper so pasted in lacked about 3½ inches from reaching the
bottom of the page, and nothing was written or printed
thereon.   That was followed by three blank pages, upon which
there were no names or writing, except three names at the
bottom of the last page.   On the page opposite the articles of
copartnership so pasted in the book, is a sheet pasted in the
book, containing thirty signatures on the front side, and
twenty-nine signatures on the reverse side, which were appar-
ently signed before it was so pasted into the book, since on the
front side they read from the top to the bottom, and on the
reverse side they read from the bottom to the top.   Then fol-
lows a second sheet pasted in the book, with thirty-two signa-
tures which read from the top to the bottom on the front side,
and thirty-six signatures which read from the bottom to the
top on the reverse side.   Then follows a third sheet pasted in

the book, with twenty-nine signatures which read from the top to the bottom on the front side, and eleven signatures which read from the bottom to the top on the reverse side. On the bottom of the blank page of the book upon which that sheet is so pasted, there are three signatures on the book itself; and that is followed by two pages of signatures upon the book itself. The balance of the book consists of numerous blank pages. In order to hold any of the defendants as such partners, it is necessary that it should appear that they actually subscribed to such articles of copartnership, or, if they signed such loose separate sheets, that they did so with the intention or understanding that they were to be attached to such articles and to become a part thereof. The burden of proving such facts was on the plaintiff. Exception is taken because the court charged the jury to the effect that, if the defendants signed their names to such sheets at a time when such articles of copartnership were in some way attached thereto, or if such articles were in some way connected with their signatures, so as to form a part of the same and make the same appear as one instrument, then such of the defendants as did so sign executed the articles of copartnership in question; that they were not to determine the force or legal effect of the transaction, but merely whether the defendants did sign the articles of copartnership or the sheets while attached thereto so as to constitute a part of the contract. We do not think there was any reversible error in such portion of the charge. There is evidence tending to show that some of the defendants merely paid a dollar and signed a list of names for the privilege of trading at the store, without any intention of signing any articles of copartnership.

2. Error is assigned because the court excluded certain testimony offered on the part of the defendants. *Henry Acker*—one of the defendants who was held liable—was called in their behalf, and, without objection, testified to the effect that he had never been at any time a member of the copartner-

ship known as the "Farmers' Union." And then, on cross-examination, he testified to the effect that about ten years before the trial he paid to Mr. Moody $1 for the privilege of trading for one year at the store, and at that time signed a paper that Moody handed to him; and upon showing him the list of signatures in the book, with his name among them, the witness continued: "This looks like my signature. I think it is my signature." Then, on redirect examination, after having testified that at the time he wrote his name on that paper he saw nothing but the other names, that his attention was not called to any contract or paper at that time, and that he neither saw nor heard of any, the court then refused to allow him to testify as to what purpose he had in signing his name, or as to what was the understanding, at the time he so signed his name on the book, as to his purpose in signing it. The name of the witness appeared upon the sixth page of the book among the list of names, with five blank pages preceding. The articles of copartnership were not written or printed in the book, but were partly written and partly printed upon a separate sheet of paper, and then pasted on the second blank page of the book as mentioned. If the articles of copartnership were not pasted in the book at the time of such signing, then it was important to determine whether they were present, and whether such signing of the list of names in the book or on the separate sheets was for the purpose or with the understanding that they were in fact subscribing to such articles of copartnership. And even if they were then pasted in the book, yet, as they were partly written and partly printed, and there are several blank pages between them and such list of names, it was important to determine whether they signed such list for the purpose or with the understanding that they were subscribing to such articles of copartnership. Certainly the defendants were not to be bound as partners merely because they signed a list of names and paid a dollar for the privilege of trading at the store. The evidence thus offered was im-

properly excluded. *Keller v. Ruppold,* 115 Wis. 636, 92 N. W. 364, 365, and cases there cited; *Seymour v. Wilson,* 14 N. Y. 567; *Fisher v. State,* 101 Wis. 26, 76 N. W. 594.

3. It appears from the examination of the same witness, and is undisputed, that, at the time the witness so signed the list of names in the book, Moody was clerking in the store, and was agent for the "Farmers' Union," and that the conversations referred to were with Moody, who had died several years before the trial. Thereupon the court held that it was incompetent for the witness to state the conversation he had with Moody, who was thus acting as the agent of the "Farmers' Union," at the time he so paid his dollar and signed his name to the list in the book. It is sought to justify this ruling by virtue of the statute, which declares, among other things:

"No party . . . shall be examined as a witness in respect to any transaction or communication by him personally with an agent of the adverse party or an agent of the person from, through or under whom such adverse party derives his interest or title, when such agent is dead, . . . unless the opposite party shall first be examined or examine some other witness in his behalf in respect to some transaction or communication between such agent and such other party or person." Sec. 4070, Stats. 1898.

Here, as indicated, the plaintiff, as such opposite party, did first examine the witness in his behalf in respect to the transaction or communication between the agent (Moody) and the witness. Assuming that *Acker* would have otherwise been incompetent to testify to the transaction or communication between himself and Moody, yet, as he first testified, on the plaintiff's examination, that at the time he signed his name to the paper handed to him by Moody he paid to Moody $1 "for the privilege of trading there" at the store, the plaintiff thereby, under the statute, opened the door and gave to the defendants the right to have the witness testify fully as to such transaction and communication; and hence the exclusion of the conversation between the witness and Moody was error.

4. But we are constrained to hold that Moody was not the "agent of the adverse party [plaintiff] or an agent of the person from, through or under whom such adverse party derives his interest or title," within the meaning of the statute. Moody was the agent of the "Farmers' Union" at the time it is claimed the defendants subscribed to the articles of co-partnership. He was never the agent of the plaintiff, nor for any person from, through, or under whom he derived his interest or title. On the contrary, he died several years before the plaintiff made the loan to the "Farmers' Union" and received therefrom the note in suit.

The several errors in the rulings of the court in respect to the competency of the witness *Acker* and his testimony were, in substance, repeated with other witnesses, some of whom signed the list of names on such loose sheets of paper, and others on the book.

5. As indicated, 120 of the defendants put in no answer and made no defense. To prove his case, the plaintiff, as an adverse party, called three of such nonanswering defendants as witnesses, under the provisions of sec. 4068, Stats. 1898. The answering defendants objected on the ground that such nonanswering defendants were not subject to be examined under that section. They testified to the effect that the general management of the business of the "Farmers' Union" was done by a committee of five, elected only by the members; that the committee elected one of their number as manager of the financial affairs and business of the partnership, and that the person so elected was the executive officer of the committee and general manager of the business; that the last committee so elected consisted of the three persons so called by the plaintiff as adverse witnesses, and two others; that such committee appointed Col. C. M. Butt as such manager, and gave him verbal authority, which was reduced to writing and entered of record by the secretary, to borrow money from the plaintiff—as much as he could borrow from him for the pur-

pose of paying off and taking up small outstanding notes against the partnership; and that the business of the partnership was so conducted entirely on borrowed capital. At the beginning of such examination the court refused to allow the answering defendants to ask such witnesses whether the copartnership was created by written articles, and, if so, whether such articles were in existence and in court; and at the close thereof the court refused to allow the answering defendants to cross-examine such witnesses. Such rulings are sought to be justified by the statute, which, among other things, declares:

"Any party to the record in any civil action . . . may be examined upon the trial of any such action . . . as if under cross-examination, at the instance of the adverse party or parties or any of them, and for that purpose may be compelled, in the same manner and subject to the same rules for examination as any other witness, to testify; but the party calling for such examination shall not be concluded thereby and may rebut the evidence given thereon by counter or impeaching testimony." Sec. 4068, Stats. 1898. *Kreider v. Wis. River P. & P. Co.* 110 Wis. 645, 86 N. W. 662.

The reason why a party may be thus examined upon the trial, "as if under cross-examination, at the instance of the adverse party," is that there is every reason to believe that his prejudice or bias, if he has any, will be in his own favor and against the party calling him, and hence leading questions may be put to him as upon cross-examination. But here no such reason exists for the rulings in question. The witnesses thus examined confessedly authorized the borrowing of the money and the giving of the note, and admit their liability thereon. They made no answer nor defense. It is for their interest that the answering defendants shall be held liable, for in that event their own liability may be lessened. They are, therefore, no more adverse parties to the plaintiff than to the answering defendants. Of course, they were competent witnesses generally; but the statute does not require,

and was never designed, to exclude cross-examination under such circumstances. After the answering defendants had rested, the plaintiff was again allowed, by way of rebuttal, to call a large number of such nonanswering defendants and examine them as adverse witnesses, and the court expressly refused to allow the answering defendants to cross-examine them. Such rulings were clearly erroneous.

6. Error is assigned because the court struck out, as sham, certain portions of the answer, to the effect that the business of the "Farmers' Union" had not been conducted in the manner prescribed by such articles of copartnership; that all purchases and sales were not made for cash; that sales were not limited to members; that the money used in the business and procured by the committee had not been limited to the amount stated in such articles; and that the answering defendants had not consented to such departures from the methods of doing the business as prescribed. The several answers were duly verified, and hence could not properly be stricken out as sham. Sec. 2682, Stats. 1898. That statute declares that: "No defense shall be deemed sham the truth of which shall be supported by the affidavit of a single witness either by way of verification to the pleadings or in opposing a motion to strike out." *Pfister v. Wells,* 92 Wis. 171, 65 N. W. 1041; *Pearson v. Neeves,* 92 Wis. 319, 66 N. W. 357.

7. The question recurs whether the defendants are aggrieved by such ruling. It is undisputed that the note was given by the authority of the committee for money borrowed from the plaintiff by the "Farmers' Union" and used for its benefit. The borrowing of money was expressly authorized by the articles of copartnership. There is no claim that the plaintiff was a member of the union, or had any knowledge of the stipulations in its articles of copartnership. The question is not as to the liability of some partners to other partners for the violation of the articles of copartnership, but whether any of those who were actual partners at the time the

money was so borrowed and used can escape liability by reason of such breaches of the articles of copartnership.    It seems to be pretty well settled that restrictions contained in the articles of copartnership, limiting the powers that are incident to the occupation or trade, do not affect the public, who are not made aware of them.    *Winship v. Bank of U. S.* 5 Pet. 529, 551; *Michigan Bank v. Eldred,* 9 Wall. 544; *Stimson v. Whitney,* 130 Mass. 591; *Barrett v. Russell,* 45 Vt. 43; *Walker v. Wait,* 50 Vt. 668; *Bromley v. Elliott,* 38 N. H. 287; *Everitt v. Chapman,* 6 Conn. 347; *Hoskinson v. Eliot,* 62 Pa. St. 393; *Rice v. Jackson,* 171 Pa. St. 89, 32 Atl. 1036; *Davis v Richardson,* 45 Miss. 499; *Prince v. Crawford,* 50 Miss. 345.    This is especially so, where, as here, the firm borrowed money and used it for the benefit of the partnership.    We conclude that the portion of the answer so stricken out did not constitute a defense nor any part of a defense, and hence the defendants were not prejudiced thereby.

8. It is contended that, even if the answering defendants subscribed to the articles of copartnership, yet they are not liable, because afterwards, and before the giving of the note in suit, the firm had been dissolved by the death and withdrawal of some members and the addition of other members. In the articles of copartnership in the case at bar, it was expressly agreed that any member might withdraw therefrom in the manner therein prescribed, and that each member should be responsible for the repayment of any amount of money borrowed by the committee to run the business, and contribute any amount necessary to repay the same. It is manifest that the firm was to consist of many members and continue for an indefinite period. The express agreement in advance for such withdrawal pretty clearly indicates that the members who remained after such withdrawal or death would continue to be a firm for the conduct of such business. True, there is no express stipulation for admitting new members,

but each subscriber was therein made responsible for moneys thereafter borrowed. Thus it is held, in a case in Massachusetts, cited by counsel for the defendants:

"If by the articles of a trading association it is apparent that it was designed to consist of many members, who might from time to time cease to be interested in the concern by voluntary withdrawal or death, and that the same business should be continued by those who should remain, and by such as would be added to their number under the terms of the articles, the death of one of them does not relieve others from liability to contribute for debts subsequently contracted without their consent or knowledge." *Tyrrell v. Washburn,* 6 Allen, 467, 476.

In that case it was said by the court that:

"Under these circumstances, it must be considered that each member agreed to be and remain a partner in the association, notwithstanding changes in others of its members, until such time as he himself should die, or withdraw therefrom by some positive act of his own."

So it has been held, in a recent case in Tennessee, that:

"Members of a partnership cannot claim that a dissolution of the firm resulted from changes in the membership, where they acquiesced in such changes." *Carter v. McClure,* 98 Tenn. 109, 38 S. W. 585, 36 L. R. A. 282.

So it has been held in Vermont, in a case cited by the same counsel, that:

"Evidence of the custom of doing business in a union store association, whose constitution and all rights and duties under it stand wholly upon agreement and consent, and not at all upon law or acts of incorporation, is admissible to show consent to or acquiescence in a practical and actual modification or change of their by-laws." *Henry v. Jackson,* 37 Vt. 431.

We perceive no good reason why such of the answering defendants as were, in fact, members of the copartnership at the time the money was borrowed and the note given, may not be held liable, as such partners, to the plaintiff. There may

be other questions suggested by counsel, but it is believed that what has been said will be a sufficient guide for a new trial.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded for a new trial.